**In re UNI–PRODUCTS, INC., Debtor.**

**UNI–PRODUCTS, INC., Plaintiff,**

v.

**Edmond L. BEARSE, Nitro–Vac Heat Treating, Inc., Felix A. Stomber, Ralph A. Bolden and RTE, Inc., Defendants.**

**Bankruptcy No. 92–31556.
Adv. No. 92–3134.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

April 23, 1993.

Randall L. Frank, Bay City, MI, for plaintiff.

William W. Allsopp, Bay City, MI, for defendants Bolden & RTE.

Richard W. Hughes, Clare, MI, for defendants Stomber and Nitro–Vac.

### OPINION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

ARTHUR J. SPECTOR, Bankruptcy Judge.

### INTRODUCTION

On December 21, 1992, the Debtor in Possession ("DIP") filed a complaint

against Ralph A. Bolden and other parties seeking, *inter alia,* "a determination that the debtor corporation is the proper and valid owner of" a Borg Warner vacuum forming machine, temperature controls, two vacuum tanks, four vacuum pumps and a hydraulic pump (collectively, the "machine"). P. 4 of DIP's complaint. The DIP filed a motion for summary judgment against Bolden on February 19, 1993. Bolden answered the motion on March 8, 1993, and filed his own motion for summary judgment on the same date. A hearing on the DIP's motion was held on March 18, 1993, and Bolden's motion was heard April 2, 1993. For the reasons which follow, Bolden's motion will be denied, and the DIP's motion will be granted.

In August, 1991, Bolden and two associates expressed an interest in purchasing the machine from Universal–Rundle Corporation. Each of the associates was to pay a third of the machine's $26,000 purchase price, and the machine was to be used by a corporation which one of the associates, Edmond Bearse, was then planning to form. Bearse incorporated the Debtor on September 12, 1991, and the machine was purchased from Universal–Rundle on November 1, 1991. Because the other associates lacked the necessary funds, Bolden paid the entire purchase price himself, and the bill of sale identified him as the purchaser.[1]

After purchasing the machine, Bolden arranged for it to be transported to a building located in Clare, Michigan. At the time of delivery, the Debtor was negotiating a lease of the building with its owner, Nitro–Vac Heat Treating, Inc. Those parties signed a lease on December 2, 1991.

In its motion, the DIP relied on two documents as evidencing a sale of the machine by Bolden to the Debtor. The first is a promissory note executed November 15, 1991, by the Debtor in favor of Bolden. The principal amount of the note is $31,500, which reflects the $26,000 paid by Bolden for the machine and miscellaneous costs

that Bolden incurred in arranging for the machine's delivery to the Clare facility. This note became due on January 2, 1992.

The second document—attached as Exhibit C to the DIP's motion—is signed by Bearse in his capacity as the Debtor's president and provides:

> The undersigned understands and agrees that title to the Borg Warner Vacuum Forming Machine shall be retained by Ralph A. Bolden until Promissory Note due on January 2, 1992, is paid in full.

This document was prepared on January 3, 1992, the day after the promissory note matured.

According to the DIP, these documents establish that the Debtor purchased the machine from Bolden, and that Bolden retained an interest in it to secure payment of the purchase price. Because Bolden did not perfect his security interest, the DIP argued, the interest can be avoided by the DIP pursuant to 11 U.S.C. § 544.

## DISCUSSION

### I. Does Bolden Hold Only a Security Interest in the Machine?

Bolden responded to the DIP's motion with three separate arguments: (1) although Bolden intended to sell the machine to the Debtor at some future date, no sale was ever made, and therefore Bolden never conveyed any interest in the machine to the Debtor; (2) the machine was never delivered to the Debtor, and therefore Bolden's purported retention of legal title in the machine effectively preserved Bolden's proprietary interest in it; and (3) there is no writing to evidence a sale of the machine by Bolden to the Debtor which would satisfy the Uniform Commercial Code's statute of frauds. These arguments will be addressed seriatim, followed by a brief discussion of Bolden's own motion for summary judgment.

### (A) Sale of the machine

■ Bolden's first argument is that he did not enter into a sales transaction with

---

**1.** More precisely, the bill of sale referred to Bolden Insulation and Sales, Inc., which also paid the consideration for the machine to Uni- versal–Rundle. The parties attach no significance to this fact, however, and I will disregard it for purposes of this opinion.

the Debtor. To the extent this argument is based on the fact that he never conveyed title in the machine to the Debtor, it is without merit. *See* Mich.Comp.Laws § 440.9102 (Article 9, which governs secured transactions, "applies to security interests created by contract including ... [a] conditional sale ... or title retention contract.")); *Litwiller Mach. & Mfg. v. NBD Alpena Bank*, 184 Mich.App. 369, 375–76, 457 N.W.2d 163 (1990); *Nauman v. First Nat'l Bank of Allen Park*, 50 Mich. App. 41, 44, 212 N.W.2d 760 (1973); *Nickell v. Lambrecht*, 29 Mich.App. 191, 199, 185 N.W.2d 155 (1970).[2]

Counsel for Bolden suggested that the relationship between his client and the Debtor may have been as bailor/bailee, rather than seller/purchaser. If the Debtor was in fact acting as Bolden's bailee with respect to the machine, then Bolden may be correct in asserting that the DIP acquired no equitable or legal interest in the machine. *See, e.g., In re Zwagerman*, 115 B.R. 540, 546–47 (Bankr.W.D.Mich. 1990), *aff'd*, 125 B.R. 486 (W.D.Mich.1991); *In re STN Enterprises*, 44 B.R. 512, 515 (Bankr.D.Vt.1984). But as noted in *Zwagerman*, a bailment is "a delivery of goods for some purpose ..., [with the goods] to be redelivered to the bailor upon fulfillment of the purpose or to be dealt with according to the bailor's direction." 115 B.R. at 547.

And counsel for Bolden submitted no evidence indicating that the machine was delivered to the Debtor for any "purpose" other than because the Debtor purchased it from Bolden, or that Bolden had given the Debtor any special "direction" regarding the machine's disposition. *See* p. 47 of Bolden's deposition ("Q. ... Until such time as the note dated November 15, 1991 was paid in full, the corporation could have physical possession to the equipment, was that the understanding? A. That's correct.").[3] Obviously, counsel's unsubstantiated intimation that Bolden and the Debtor may have established a bailor/bailee relationship, rather than entering into a conditional sales transaction, does not establish "a genuine issue for trial" under F.R.Civ.P. 56(e) (incorporated by F.R.Bankr.P. 7056).[4] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). I therefore reject Bolden's assertion that the parties' agreement was anything other than a sale.

## (B) Delivery of the Machine

Since physical possession of the collateral is one means by which a lender can perfect its security interest, *see* Mich. Comp.Laws § 440.9305, delivery of the goods in question is obviously not essential to a finding that a security interest has

---

**2.** Bolden repeatedly acknowledged that his purpose in retaining title was to secure payment of the note. *See infra* pp. 770–771. Nor is there any doubt that the Debtor understood why Bolden retained title. *See* pp. 14–15 of Bearse's Deposition. And while the parties to the agreement may have believed or assumed that a transaction under such terms does not constitute a sale unless and until title is conveyed, that belief/assumption is utterly irrelevant for purposes of Mich.Comp.Laws § 440.9102. *See Nickell*, 29 Mich.App. at 199, 185 N.W.2d 155 (Article 9 "applies to any transaction regardless of its form which is intended to create a security interest in personal property."); *cf.* UCC § 9–102 (Official Code Comment) ("Transactions in the form of consignments or leases are subject to [Article 9] if the understanding of the parties or the effect of the arrangement shows that a security interest was intended.

**3.** Bolden's counsel argued that his client never explicitly authorized the Debtor to use the machine, an assertion which is supported by the

record. *See* Bolden's Deposition at p. 51 ("Q.... [W]hat was your understanding if [the Debtor] would have started production? A: I have no answer because it never was discussed.") But I think it would be entirely reasonable under the circumstances for the Debtor to assume that it could utilize the machine unless explicitly instructed by Bolden not to do so. And even if it were fair to infer from the absence of any discussion on the subject that the Debtor had no authority to begin production with the machine, that only begs the question which Bolden never addressed: i.e., what was the purpose of the alleged bailment?

**4.** It may be that Nitro–Vac, the eventual lessor of the Clare facility to which Bolden had the machine delivered, acted as a bailee on behalf of Bolden and/or the Debtor. But assuming that that is the case, Bolden did not argue—let alone offer proof—that Nitro–Vac continued to hold the machine as a bailee even after December 2, 1991, when the Debtor and Nitro–Vac executed the lease agreement which gave the Debtor possession of the facility.

been created. *Cf.* Ronald A. Anderson, 3 *Uniform Commercial Code* § 2–401:22 (3d ed. 1992) ("The fact that the seller retains possession of the goods does not bar concluding that title has passed to the buyer. The seller may be retaining possession under his unpaid vendor's lien when the goods were not sold on credit, or the seller may be retaining possession to accommodate the buyer in some way." (Footnote omitted)). Pursuant to Mich.Comp.Laws § 440.2401(1), however, "[a]ny retention or reservation by the seller of the title (property) in goods *shipped or delivered to the buyer* is limited in effect to a reservation of a security interest." (emphasis added). Thus Bolden's contention that his ownership interest has not been transformed into a security interest must fail if, notwithstanding the fact that he purported to retain legal title, the machine was shipped or delivered to the Debtor. *Cf.* Mich.Comp. Laws § 440.2403(1) (A party acquires voidable title—i.e., the "power to transfer a good title to a good faith purchaser for value"—if the "goods *have been delivered* [to the party] under a transaction of purchase." (emphasis added)).

The Uniform Commercial Code does not define the term "delivery" as it relates to goods such as the machine. But it does define the delivery of "instruments, documents of title, chattel paper, or certificated securities" as the "voluntary transfer of possession." Mich.Comp.Laws § 440.-1201(14). This straightforward definition is consistent with the common understanding of the term's meaning. *See, e.g., Black's Law Dictionary* (5th ed. 1979) (Delivery is "[t]he act by which the res or substance thereof is placed within the actual or constructive possession or control of another.") As noted in *Black's,* "[w]hat constitutes delivery depends largely on the intent of the parties." *Id.* Thus the inquiry here is whether Bolden transferred possession of the machine to the Debtor and, if so, whether that transfer was voluntary and intentional.

■ There is some disagreement among courts as to whether "possession" under the Uniform Commercial Code means nothing more than "physical control" of the goods, or if some other criterion—such as the ability to deny access to all other parties—must also be satisfied. *See generally Citizens Nat'l Bank of Denton v. Cockrell,* 850 S.W.2d 462, 463–66 (Tex.1993). For the reasons stated in *Cockrell,* I believe that possession should in this context be defined as just that: simple physical possession of the goods in question. *See Cockrell,* 850 S.W.2d at 465 (Possession should be "interpreted in light of the impression conveyed to an observer not involved in the transaction ... between the buyer and seller.... [It is] the simple physical control that to outside parties suggests ownership rights.").[5]

As noted, Bolden arranged for the machine to be shipped to the Clare facility after he purchased it from Universal–Rundle. And it is clear from the record that he chose that site precisely because the Debtor planned to lease the building and commence its operations there.[6] The Debtor did in fact enter into a lease no more than a few weeks after the machine was delivered to the facility, and thereby acquired physical possession of the machine.[7] *Cf. Cock-*

---

**5.** The issue in *Cockrell* was whether the holder of a purchase money security interest had perfected that interest within 20 days after "the debtor receive[d] possession of the collateral." *See Cockrell,* 850 S.W.2d at 463 (Michigan's version of this Uniform Commercial Code provision is codified at Mich.Comp.Laws § 440.-9312(5)). But *Cockrell's* focus on the notice function that physical possession serves is equally appropriate here, since the rights of third parties are fully implicated by Mich.Comp. Laws § 440.2401(1).

**6.** At the hearing held March 8, 1993, Bolden's counsel explained that his client had the ma-

chine delivered to the Clare facility "with the belief that it was likely that that's where Uni-Products was gonna want it."

**7.** That the Debtor obtained possession of the machine was unequivocally conceded by Bolden. *See* Bolden's deposition at p. 45, lines 1–7; *id.* at p. 47, lines 13–17; *see also* Exhibit I of DIP's Response to Bolden's Motion for Summary Judgment (letter signed by Bolden on the Debtor's behalf which advised a third party that the machine "has been transported to our Clare Facility" and that "[w]e expect erection [of the machine] to be complete by the end of December").

*rell,* 850 S.W.2d at 462–63, 466 (purchasers held to have acquired possession of the equipment in question on the date they assumed the lease of a "warehouse where the equipment was located").

Bolden's reliance on the fact that the Debtor lacked a formal leasehold interest in the building at the time the machine was delivered misses the point. There is no doubt but that Bolden's objective was to put the machine into the Debtor's "hands," so to speak, and that this objective was achieved no later than December 2, 1991, when the Debtor signed its lease with the owner of the facility housing the machine. Because this transfer of possession was neither inadvertent or coerced, I hold that the machine was in fact "delivered" to the Debtor, notwithstanding that delivery may have been effectuated using Nitro–Vac as a bailee. *See supra* n. 4. *Cf. Gorman v. Brossard,* 120 Mich. 611, 617, 79 N.W. 903 (1899) ("There may be a delivery without [the seller] handling the property or changing its position [, such as by] directing a bailee of the goods to deliver them to the buyer, with the assent of the bailee to hold the property for the new owner. In such case there is ... an act by which the dominion over the goods is transferred from the seller to the buyer." (quoting *Schindler v. Houston,* 1 N.Y. 261 (1848) (Bronson, J., concurring))). Accordingly, Bolden's retention of title in the machine "is limited in effect to a reservation of a security interest." Mich.Comp.Laws § 440.-2401(1).

## (C) Statute of Frauds

■ Bolden also argued that there is no writing evidencing a sale of the machine that would be enforceable against him. With exceptions to be discussed *infra,* Mich.Comp.Laws § 440.2201(1) provides that "a contract for the sale of goods for the price of $500.00 or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Bolden did not sign Exhibit C, the document which links payment of the promissory note to Bolden's continued retention of title to the machine. Before determining the significance of the omitted signature, however, I will first determine whether Exhibit C is a "writing sufficient to indicate that a contract for sale has been made between the parties."

■ As previously stated, Exhibit C provides that Bolden is to retain title in the machine until the "Promissory Note due on January 2, 1992, is paid in full." Bolden's own deposition confirms what is rather obvious from the text of Exhibit C: namely, that upon payment by the Debtor of the note which it had executed in Bolden's favor, Bolden was to convey title to the Debtor. *See* p. 49 of Bolden's deposition ("Q. And once the corporation paid you those monies, you were then going to give a bill of sale to the corporation? A. That is correct").[8]

Exhibit C leaves no reasonable doubt as to (1) the property sold; (2) its purchase price; or (3) the parties to the transaction.[9] Under these circumstances, I hold that Exhibit C constitutes a "writing sufficient to indicate that a contract for sale has been

---

**8.** Reference to Bolden's deposition is appropriate here because, in determining whether a writing is sufficiently clear so as to take it outside the scope of the statute of frauds, "extrinsic evidence may be used to supplement, but not contradict, the terms of" the writing. *Opdyke Inv. Co. v. Norris Grain Co.,* 413 Mich. 354, 367, 320 N.W.2d 836 (1982).

**9.** Although Exhibit C does not specify the time within which the purchase price—i.e., the note—must be paid, that term is not essential. *See Duke v. Miller,* 355 Mich. 540, 543, 94 N.W.2d 819 (1959) (Because the court will presume that a contract is to be performed within a "reasonable time," a writing may be "sufficient under the statute of frauds" even if it does not indicate when payment is to be made.). *See also* Mich.Comp.Laws § 440.2201(1) ("A writing is not insufficient because it omits ... a term agreed upon...."); U.C.C. § 2–201 (Official Code Comment) ("The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real ... transaction.").

made." *See* UCC § 2–201 (Official Code Comment) ("The only term which must appear is the quantity term.... The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted."); *cf. Restatement, Second, Contracts* § 131.

■ The next question is whether Exhibit C is enforceable without Bolden's signature. The requirement of a writing signed by the party resisting enforcement of the contract is not applicable

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made ...; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted [pursuant to Mich.Comp.Law § 440.-2606].

Mich.Comp.Laws § 440.2201(3).

With respect to the first of these two exceptions, the DIP identified several statements by Bolden which are tantamount to an acknowledgement that the Debtor had in fact agreed to purchase the machine. *See* Bolden's deposition at p. 38 ("Because the understanding was that I had with Mr. Bearse, as I stated before, was that I would purchase the machine and correspondingly as soon as they got the money from whatever source they were going to get it from, they were going to pay me back the money they owed me."); ¶ 7 of Bolden's Countercomplaint ("That Uni–Products, Inc. agreed to reimburse Ralph A. Bolden for the purchase of [the machine]; that the parties agreed that Ralph A. Bolden would retain title to such until such time as all debts and obligations arising out of the purchase, transportation and delivery of [the machine] were fully paid and satisfied."); ¶ 3 of Bolden's affidavit ("That in consideration of my purchase of [the] machine, I was to retain ownership and title of said machine until all sums owing me by notes executed on January 2, 1992, were paid in full." [10]); p. 25 of Bol-

den's deposition ("I said, well, I will go ahead and pay the balance [owed to Universal–Rundle for purchase of the machine] with the understanding that once [Bearse] got the money, whether it came from him or his other investors and so forth, he would pay me. And I told him I would take a note out and I would retain possession of the machine until he paid me. When I say possession, I meant to say title."); p. 70 of Bolden's deposition ("Because, again, it was just a transaction that I was just actually giving a loan to Mr. Bearse and the thing that was protecting my loan was the fact that I would not pass that title until I got my money back.").

Most important of all, Bolden explicitly acknowledged that, far from being a document that he had never seen before the present litigation, Exhibit C was prepared at Bolden's request to protect his interest in the machine. Bolden explained Exhibit C as follows:

That was the formal writing of [the parties' understanding] because, again, what [Bearse] said to me at the time was that he had other investors that were talking with them. And when he was talking with other investors, I wanted to make sure everybody knew that the machine belonged to Ralph A. Bolden and that the machine was mine until someone paid me the money.

Bolden's Deposition at pp. 46–47. Based on these statements, I find that Mich.Comp.Laws § 440.2201(3)(b) applies.

■ The exception codified in subsection (c) of Mich.Comp.Laws § 440.2201(3) is also applicable. Pursuant to that subsection, the DIP need not produce a writing signed by Bolden if the machine was "received and accepted" as per Mich.Comp.Laws § 440.-2606. The latter provision states that goods have been accepted when the buyer:

(b) fails to make an effective rejection [of the goods], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

---

**10.** This presumably is a reference to the note executed on November 15, 1991, and due on January 2, 1992.

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Mich.Comp.Laws § 440.2606(1).

The record strongly suggests that subsection (b) is satisfied in this case. There is no indication that the Debtor ever purported to reject the machine, and, as the machine was in the Debtor's uninterrupted possession since December 2, 1991, one would certainly think that it had more than ample time to do so. The DIP did not raise that issue, however, so for present purposes I will assume that Mich.Comp.Laws § 440.2606(1)(b) is not applicable.

But the DIP did identify portions of Bolden's deposition testimony which demonstrate that Mich.Comp.Laws § 440.-2606(1)(c) also applies. As noted by the DIP, "Bolden assisted Bearse in preparation of a balance sheet for the debtor corporation dated February 29, 1992, which stated that the debtor corporation owned the machine which had a value of $800,-000." P. 4 of DIP's brief (citing pp. 67–68 of Bolden's deposition). Similarly, Bolden helped Bearse prepare a kind of prospectus for the Debtor, which indicated that "Uni–Products, Inc. owns the world's largest thermo-vacuum machine. . . . The machine is in excellent condition and has an appraised value of $750,000.00." *Id.* at pp. 4–5 (citing pp. 56–58 of Bolden's deposition). In addition, Bolden, on behalf of the Debtor, sent Exhibit I, a letter dated December 2, 1991, which advised a third party that the machine was at "our Clare Facility," and would soon be erected there, strongly implying that the machine was the corporation's property. These documents are of course inconsistent with Bolden's contention that he owned the machine. And in light of the fact that Bolden prepared them or at least assisted in their preparation, it would certainly seem that he ratified the Debtor's acts (assuming they were wrongful as against Bolden, as Bolden now contends).

At the hearing on the DIP's motion, counsel for Bolden suggested that there was no ratification because his client assumed or understood that these financial statements were prospective, in that they purported only to describe the Debtor's status once the note to Bolden was paid. But contrary to F.R.Civ.P. 56(e), counsel offered no evidence, in the form of an affidavit from Bolden or otherwise, to support that contention.

Even if counsel's assertion is correct, moreover, there was no apparent justification for Bolden's understanding as to the significance or import of the documents he prepared or helped the Debtor to prepare. The letter's reference to the machine being placed at "our Clare Facility" was without explanation that the machine was Bolden's and not the Debtor's. The assertion in the balance sheet and prospectus that the machine is owned by the Debtor was not qualified or characterized as contingent in any respect, and there is no evidence that Bearse suggested to Bolden that the statements would not be distributed or made public until the note was paid. Bolden did not object to the Debtor asserting ownership of the machine in these statements, and this implicit ratification is not negated by Bolden's unspoken and unwarranted understanding as to what the documents meant or how they would be used. *See* UCC § 3–404 (Official Code Comment) ("[T]he word 'ratified' is used [in the statute] to make it clear that the adoption . . . may be found from conduct as well as from express statements."); *Restatement, Second, Contracts § 19* ("(1) The manifestation of assent may be made wholly . . . by failure to act."); *cf. Heritage Broadcasting Co. v. Wilson Communications,* 170 Mich.App. 812, 818, 428 N.W.2d 784 (1988) ("A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.") Thus I hold that Mich.Comp.Laws § 440.-2201(3)(c) applies because the machine was "received and accepted" by the Debtor for purposes of Mich.Comp.Laws § 440.-2606(1)(c).

Section 440.2201(3)(c) would also render a signed writing unnecessary if Bolden accepted "payment" from the Debtor for the

machine. The quoted term, which is not defined by the Uniform Commercial Code, is generally understood to mean the "discharge of an obligation or debt," *Black's Law Dictionary* (5th ed. 1979), and the Michigan Supreme Court has endorsed that definition in a statute-of-frauds context. *See Cassidy v. Kraft–Phenix Cheese Corp.,* 285 Mich. 426, 433, 280 N.W. 814 (1938) ("The payment required by the statute is the usual payment ... whereby the vendee unconditionally transfers money or property to the vendor *which the vendor unconditionally accepts in discharge, pro tanto, of the purchase price."* (emphasis added; quoting *Leonard v. Roth,* 164 Mich. 646, 652, 130 N.W. 208 (1911)). But the Uniform Commercial Code also recognizes the concept of a *conditional* payment. *See* Mich.Comp.Laws § 440.2511(3) ("[P]ayment by check is conditional and is defeated ... by dishonor of the check on due presentment."). And for the reasons which follow, I believe that such conditional payments are within the scope of Mich.Comp. Laws § 440.2201(3)(c).

The premise underlying that subsection's exception as to "goods for which payment has been made and accepted" is that such payment offers sufficient evidence that a sale transaction did in fact occur between the parties, notwithstanding the absence of a written sale contract signed by the defendant. *See, e.g., 72 Am.Jur.2d, Statute of Frauds* § 148 ("The rationale of the provision permitting payment ... to satisfy the statute is that when an overt act has taken place which presupposes that a sale or agreement to sell has been concluded, the danger of fraudulent intervention and perjury is diminished. Receipt and acceptance of the price constitutes an unambiguous overt admission by both parties that a contract actually exists.") (Footnote omitted). And it makes no sense to say that the signed-writing requirement should be waived if the defendant/seller accepted a cash payment, but not if he accepted a check: The evidentiary value of the ex-

change is the same in either instance. As explained by a leading commentator:

> [I]t must be remembered that the word "payment" has been used in two senses or for two purposes. When the buyer gives the seller a check there is by the majority modern rule a payment for (1) the purposes of the statute of frauds, although for (2) the purpose of discharge of the debt, there is no payment until the check is honored.

Ronald A. Anderson, 2 *Uniform Commercial Code,* § 2–201:205 (3d ed. 1992).

■ Because the issue under Mich. Comp.Laws § 440.2201(3)(c) is whether the parties entered into a sale agreement, rather than whether a debt arising from the agreement has been discharged, I conclude that a sale agreement which is not evidenced by a writing signed by the seller may nevertheless be enforceable if the seller accepted conditional payment for the goods in question from the purchaser. *See* UCC § 2–201 (Official Code Comment) ("[P]art payment may be made by money *or check,* accepted by the seller." (emphasis added)); *see also Restatement, Contracts § 205* ("There is a payment under the provisions of the Statute [of Frauds] relating to contracts [for the sale of goods] when the buyer ... pays the price therefor in whole or in part ... in a check ... [or] promissory note...." [11]); *Miller v. Wooters,* 131 Ill.App.3d 682, 86 Ill.Dec. 835, 476 N.E.2d 11, 40 U.C.C.R.S. 1623, 1625 (1985) (collecting authorities for the proposition that "delivery of a check by the buyer to the seller constitutes a 'payment' within the meaning of the statute [of frauds]"); *Charles R. Ablett Co. v. Sencer,* 130 Misc. 416, 224 N.Y.S. 251, 255 (1927) (payment by check).

This conclusion is not inconsistent with the holdings of the Michigan Supreme Court in *Cassidy* and *Leonard. See supra* p. 772. In *Cassidy,* the Plaintiff argued that the statute of frauds was inapplicable based on certain expenses that he allegedly

---

**11.** The *Restatement* illustrates § 205 with the following example:

> A contracts to sell and B to buy ... specific goods.... B gives his check as whole or partial *conditional* payment for the price. There has been payment within the meaning of the Statute.
> (emphasis added).

incurred in anticipation of performing the contract. *See* 285 Mich. at 432–33, 280 N.W. 814. Similarly, the payment at issue in *Leonard* was made to the would-be seller's attorney under a kind of escrow agreement, rather than to the seller. *See* 164 Mich. at 649–651, 130 N.W. 208. Thus *Cassidy* and *Leonard* are readily distinguishable from the facts here, because in neither of those cases was the court confronted with a situation where the purported payment was actually tendered to, and accepted by, the other party to the alleged agreement.

Nor did either *Cassidy* or *Leonard* present the issue of whether a check or other instrument may constitute a payment for statute-of-frauds purposes. These cases also pre-date the Uniform Commercial Code which, as indicated *supra* p. 772, specifically provides in the Official Code Comment that a check may constitute a payment under UCC § 2–201. They therefore do not stand for the proposition that conditional payment is outside the scope of Mich. Comp.Laws § 440.2201(3)(c).

■ In this case, the Debtor gave Bolden a promissory note, which the Uniform Commercial Code does not explicitly define as a conditional payment. But this should not change the result. The only distinction made by the Uniform Commercial Code between a "check" and a "note" is that the former is a "draft" while the latter is a "promise," *see* Mich.Comp.Laws § 440.3104(2), a distinction which would seem to be irrelevant to the question of whether the instrument represents a "conditional" payment. After all, these definitions simply mean in effect that the "condition" to be satisfied with respect to a check is that the "draft" be honored, whereas with a note the "promise" must be fulfilled. *See* Mich. Comp.Laws § 440.3802(1) (with limited exceptions, "where an instrument is taken for an underlying obligation ... (b) ... *the obligation is suspended pro tanto* until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored action may be maintained on either the instrument or the obligation...." (emphasis added)).[12]

In contrast to checks, of course, notes are not typically payable on demand. One could therefore argue that, at least in a colloquial sense, they are more accurately characterized as a financing arrangement rather than payment on the debt. But when the issue is whether there is an acceptable evidentiary substitute for a written purchase agreement signed by the defendant/seller, I fail to see why it matters whether the instrument accepted by the seller is payable immediately or does not mature until much later. As with the distinction between payment by money versus payment by check, the check/note distinction overlooks the fact that the issue under the UCC's statute of frauds is whether the parties in fact reached an agreement, not whether a debt remains unpaid.

There is support for the view that a promissory note does not constitute a payment sufficient to take a transaction out of the statute of frauds. *See, e.g., Penn Anthracite Mining Co. v. Clarkson Securities Co.*, 205 Minn. 517, 287 N.W. 15 (1939); 72 *Am.Jur.2d, Statute of Frauds* § 152 (collecting cases). But the rationale offered for this conclusion is that a note does not discharge an obligation. *See Penn Anthracite*, 287 N.W. at 18–19; *Reynolds v. Bryant*, 281 Ala. 372, 202 So.2d 734, 737 (1967); *Howse v. Crumb*, 143 Colo. 90, 352 P.2d 285, 288 (1960); *Illinois–Indiana Fair Assoc. v. Phillips*, 328 Ill. 368, 159 N.E. 815, 818 (1927); *Krohn v. Bantz*, 68 Ind. 277, 284 (1879). And since discharge *vel non* of the debt is irrelevant to the narrow question of whether the parties entered into a purchase transaction, these authorities are unpersuasive.

■ For the reasons discussed, the better view is that a promissory note is indistinguishable from a check for statute-of-

**12.** This provision is significant because it applies equally to checks and notes—each of which can qualify as an "instrument" for UCC purposes. *See* Mich.Comp.Laws § 440.3104. And because the note given to Bolden meets the requirements of Mich.Comp.Laws § 440.3104(1), it is by definition a "negotiable instrument," and therefore an "instrument." *See* Mich.Comp.Laws § 440.3102(1)(e) ("'Instrument' means a negotiable instrument.").

frauds purposes. *See Bohrer v. Auslander*, 133 Misc. 597, 233 N.Y.S. 182 (1929); *Restatement, Contracts* § 205 (quoted *supra* pp. 772–773). I therefore conclude that Bolden's acceptance of the note was an acceptance of payment (albeit conditional) pursuant to Mich.Comp.Laws § 440.-2201(3)(c).[13]

This same result can be reached using the Michigan Supreme Court's analysis in *Driggs v. Bush*, 152 Mich. 53, 115 N.W. 985 (1908). That case involved an oral contract for the sale of hay, pursuant to which the plaintiff/buyer was to pay for the hay to be baled. 152 Mich. at 54, 115 N.W. 985. The defendants/sellers allowed the plaintiff to bale the hay, but then refused to consummate the sale. *Id.* In rejecting the defendants' statute-of-frauds defense, the court reasoned as follows:

> [T]here can be no doubt in this case that the service of baling this hay was received and accepted by these defendants, and if this was done at a time while the hay remained their property, and such service was received in pursuance of the contract made between the parties, we can conceive of no valid objection to treating this as a part payment of the consideration which was to pass from the plaintiff to the defendants at a time prior to the passing of the title of the hay to plaintiff. That being so, there has been a payment by the plaintiff and a receipt by the defendants of a part of the consideration. It was the hay in its improved form as baled hay which ... was to pass from the defendants to the plaintiff, and ... *it cannot be successfully contended that the defendants have not received the value of services performed by the plaintiff in pursuance of this contract.* Suppose this agreement had been on the part of the plaintiff to pay a stated price for this hay when baled and delivered and at the same time to thresh defendants' oats on the farm. The contract would not be materially different. In the one case as in the other, *plaintiff is performing a service for defendants which increases the value of their property. It is not necessary that the payment made upon the contract be made in money.*

152 Mich. at 55–56, 115 N.W. 985 (emphasis added); *see also id.* at 58, 115 N.W. 985 ("[A]ny work done upon the hay in baling the same, *passed a present benefit* from the purchaser to the seller, and as it was done in pursuance of the contract, it could be nothing else than payment upon the contract.... [T]his contract was validated by *the receipt of the benefit* of baling the hay in pursuance of the contract." (emphasis added)).

■ The principle to be derived from *Driggs* is that payment sufficient to take a case out of the statute of frauds is made if the defendant accepted anything of value from the plaintiff pursuant to the alleged contract. And that is exactly what occurred in this case. The note which Bolden accepted from the Debtor was in pursuance of the parties' agreement that the Debtor would reimburse Bolden for his machine-related expenditures. And the note was certainly valuable, inasmuch as it provided Bolden with at least *prima facie* evidence of his right to payment. *Cf. Gorman*, 120 Mich. at 619, 79 N.W. 903 (To constitute payment under the statute of frauds, "[t]he agreement to pay the note or satisfy the debt must be consummated and carried into effect *by an act which shall be obligatory upon the purchaser*, and enable the vendor to enforce the contract of sale...." (emphasis added; quoting *Brabin v. Hyde*, 32 N.Y. 519 (1865)).

---

**13.** The fact that the conditional payment was ultimately "defeated" by virtue of the Debtor's failure to pay the note does not call for a different result. The inquiry under Mich.Comp.Laws § 440.2201(3)(c) is whether the promissory note was *accepted*, not whether the promise was subsequently fulfilled. *See* Ronald A. Anderson, 2 *Uniform Commercial Code* § 2–201:205 (3d ed. 1992) (Even if "the drawer stops payment on the check, ... the fact remains that it was given and the fact remains that it was accepted and it is this payment and acceptance that bars the statute of frauds."); *id.* at § 2–201:207; *see also Miller v. Wooters*, 131 Ill.App.3d 682, 86 Ill.Dec. 835, 476 N.E.2d 11, 40 U.C.C.R.S. 1623, 1625 (1985); *Charles R. Ablett Co. v. Sencer*, 130 Misc. 416, 224 N.Y.S. 251, 255–56 (1927).

Moreover, since the note is a negotiable instrument, *see supra* n. 12, Bolden could have sold his right of payment under the note to a third party, who may then have been able to enforce the note notwithstanding most defenses that the Debtor could have asserted against Bolden. *See* Mich.Comp.Laws §§ 440.3302(1), 440.3305 and 440.1201(20). This option made the note particularly valuable to Bolden. *Cf.* Mich.Comp.Laws § 440.3303(c) (a holder who takes an instrument in exchange for a negotiable instrument is deemed to have given value for the instrument).

Thus as an alternative to viewing the note as a conditional payment, I conclude that it can appropriately be regarded as an instrument which, because of its inherent economic value, constituted a partial payment by the Debtor to Bolden. The "payment" exception provided by Mich.Comp. Laws § 440.2201(3)(c) to the requirement of a signed writing is therefore also applicable under this theory.

For these reasons, I reject Bolden's contention that there is no enforceable agreement between the parties. Exhibit C satisfies Mich.Comp.Laws § 440.2201(1)'s requirement that there be a writing evidencing a sale, and subsections (3)(b) and (3)(c) of that statute render the signature requirement inapplicable. In the alternative, I hold that, even if Exhibit C is not a sufficient writing for purposes of Mich. Comp.Laws § 440.2201(1), the writing requirement is not applicable here because subsections (b) and (c) of Mich.Comp.Laws § 440.2201(3) are satisfied. *See* UCC § 2–201 (Official Code Comment) ("[T]he agreed price of any goods actually delivered can be recovered *without a writing* or, if the price has been paid, the seller can be forced to deliver an apportionable part of the goods." (emphasis added)).

**(D) Bolden's Motion for Summary Judgment**

As noted, Bolden filed a counter-motion for summary judgment. This motion asserted that summary judgment in favor of Bolden was appropriate because Bolden never sold an interest in the machine to the Debtor, and the DIP therefore did not acquire any such interest when the Debtor filed its bankruptcy petition. This argument relies entirely on Bolden's response to the DIP's motion for summary judgment. Thus for the reasons already discussed, it is rejected.[14]

**II. *Is Bolden's Security Interest Subordinated?***

Having concluded that Bolden sold the machine to the Debtor and retained only a security interest, the next issue is whether that interest remains enforceable against the DIP. As previously discussed, the machine was delivered by Bolden to the Debtor, and the Debtor retained it until filing bankruptcy. Because the machine was in the Debtor's possession, Bolden had to file a financing statement to perfect his security interest. *See* Mich.Comp.Laws §§ 440.9113 and 440.9302. Having failed to do so, Bolden's security interest would be subordinate to the rights of a lien creditor. *See* Mich.Comp.Laws § 440.9301(1)(b). Since the DIP enjoys the same status as a judicial lien creditor, *see* 11 U.S.C. § 544(a)(1),[15] Bolden's security interest is likewise subordinate to the DIP's interest in the machine. *See In re C.J. Rogers, Inc.*, 150 B.R. 413, 415 (Bankr.E.D.Mich.

---

**14.** In this same motion, Bolden also argued that the Debtor's case should be dismissed pursuant to 11 U.S.C. Section 1112(b) because it was filed in bad faith. This argument is procedurally defective because it does not raise an issue that is appropriate for litigation in an adversary proceeding. *See* F.R.Bankr.P. 7001. Moreover, the dismissal motion was not served on all parties listed in the Debtor's mailing matrix, as required by F.R.Bankr.P. 2002(a)(5). Therefore this relief will be denied as well.

**15.** Section 544(a) provides that "[t]he trustee shall have ... the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—(1) a creditor that extends credit to the debtor ... and that obtains ... a judicial lien on [the debtor's] property." *See also* Mich. Comp.Laws § 440.9301(3) ("A 'lien creditor' ... includes ... a trustee in bankruptcy from the date of the filing of the petition...."). With exceptions not relevant here, the DIP has "all the rights ... and powers ... of a trustee." 11 U.S.C. § 1107(a).

1992); *In re Churchwell,* 80 B.R. 855, 860 (Bankr.W.D.Mich.1987).

### *SUMMARY*

The exhibits and Bolden's own deposition establish that Bolden sold the machine to the Debtor. Because the machine was delivered to the Debtor, Bolden retained only a security interest in it following the sale. The sale agreement is enforceable even in the absence of a writing signed by Bolden because (1) Bolden admitted in his pleadings that the sale was made; (2) Bolden accepted payment from the Debtor for the machine; and (3) Bolden ratified acts by the Debtor which were inconsistent with Bolden's claim that he owned the machine. Bolden failed to perfect his security interest, and the DIP may therefore subordinate Bolden's lien. An appropriate order shall enter.